The next case is also Celspin Soft v. Fitbit, et al., 1821, 78, 79, 88, 81, 83, and 84. And Mr. Edmonds again. Thank you, Your Honor. Here, the district court clearly erred, and the first clear error was in finding that Celspin's claims were exceptionally weak. And that's really something this court can review on its own. This court is aware of its own precedents. This court is aware of the law in this area. And including based on the discussion we've already had, which we obviously don't need to repeat, Celspin's claims were not exceptionally weak. Two things that I'd ask the court to focus on are, which the district court just didn't was, you know, as Judge O'Malley correctly pointed out, the district court really focused on step one and being unconvinced that — The district court was also concerned with your litigation tactics. And I'll get to that in just one moment. The district court also — a large part of the district court's opinion was just clear error in saying that these claims or these facts are just the same thing as TLI and seven other cases that were put in a footnote. And they're simply very different. In fact, Judge O'Malley already pointed out a difference between TLI. But just that false premise alone that the facts of this case and these claims are so similar to TLI or to content extraction that the case exceptional, that's just not — that is clearly erroneous. You say the timing of your amended complaint was premised on the timing of our case law. Could you have filed it earlier based on directions from us? I don't — I don't think until — until we read Berkmer and Atrix and then the commentary came out on that and then in a very short period of time also point out that there was a procedural issue in the court. The parties had submitted a stipulation that pleadings could be amended, but the court hadn't signed it. It was — the court signed it three days before we made the amendment, which I think is maybe a Friday to a Monday. But it was — there's no — it was done promptly after this new law came to our attention. And I think it's — from our perspective, Atrix certainly in terms of — it just — it was something that was new and something that it was our duty to add the allegations. What about the court's view that you should have filed a test case? Well, you know, this court's never required that. That's not — that shouldn't be a requirement. You know, patents are diminishing assets. They have term. They're — you know, this court has said before that the number of cases is not dispositive of the merits. When we talk about — But if — I mean, if — I know almost the first thing you said was that this case really isn't squarely controlled against you by TLI and electric power. But if it were, then isn't the only responsible thing to do to file a complaint, immediately acknowledge that you must lose in the district court, thereby saving hundreds of thousands of dollars of defense costs at that level? And we want to take it up to the Court of Appeals to try to get federal circuit law altered so that what we think is an eligible set of claims will be held eligible, which right now, under governing federal circuit law, it can't be. In this court — That's a long-winded way of saying, make it a test case where all the action takes place north of the district court. That's really changing the rules of the game after it's — after the game has been played. When this — in this court's precedence, when it's focused on the number — The TLI and electric power games have been played. But I mean — but I mean, in other words, the guidance provided by this court, okay, and for example, in Edeka, they sued a couple hundred defendants, and they were nuisance settlements. So this court could look at it and say that there's a — there's a bad motive for all these — The test case point would be true if it were a single case. So never mind that it was a number of defendants. Well, it's — if — if we believed that the claims were — were invalid and we wanted to send it up to get it tested, then a test case would be a prudent thing to do. But we didn't believe that, and there's no — there's no finding that we did. That's — that's what, in Edeka, you know, the evidence was, that they really — that they believed the claims were invalid. That's why they were settling out for $3,000 the day before the 101 hearing, because they knew they were going to lose. But when you have a case here that has contested — legitimately contested issues, legitimately it goes too far to require the filing of a test case. But we decided Berkramer and Atrix after those cases, right, in terms of setting out the framework for the step two. Yeah, Berkramer — right. Berkramer — this was basically — right. So — so — so the parties didn't — weren't aware that these — you could rely on these factual allegations. Now, we certainly made those arguments already, but those — those criticized for saying, well, those are just your inferences you're drawing from the claimed invention. There's not facts to back them up. Now — now, with Atrix, you can actually plead those as facts. But it's not like this was an epiphany that it's battery-saving or that it's — or that it's more efficient or the combination itself is — is sufficiently inventive. Those arguments were already being made, and then Atrix came out and said that you can — you can allege facts in the complaint, and those should be honored. Counsel, the trial judge kept on asking you or your colleague, where's the inventive concept? And it's back and forth, and you or your colleague kept on answering, well, it's just a distillation of — of abstract — there's a distillation of abstract ideas. She was frustrated. She was trying to — trying to — to get to the nub of the case, and she couldn't. I think — I think where that was in the transcript was that we were trying to show her what the claims were directed to, so then — so then you could get to answering the question. Because if you just start from the premise that the claims are directed to acquiring, transferring, publishing data, you've already looked at it at such a high level of abstraction, it's difficult to answer the question. We were trying to point out what the claims were directed to, so then we could use that as a baseline for the discussion, and, you know, the — the transcript of that hearing is a little hard to follow. What you also need to look at is the — the submission that went with it that she was reviewing that was — that she let us file after the hearing that made these very points, but the district court several times just interrupted and didn't want us to repeat what was on the presentation in front of her. She also criticized your unwillingness to stay discovery. Well, that — you know, that — that really does — that's another clearly — clearly erroneous assessment in the sense that the record is that — that Selspin responded to the defendant's request to stay by saying, Your Honor, take a look at our — our responsive 101 brief. It's going to be due next week, and if you — and if you're inclined to grant the stay. If not, don't grant the stay, and the court didn't grant the stay. She — she — she — she allowed it, so, you know, that just — it's hard to — it's hard to say that that is — if there's anything improper or overly aggressive about saying just take a look at our responsive brief before you make the decision. Supreme Court has told us that there's an abuse of discretion standard on exceptional case, misconduct, and we weren't there, and she was, and so don't — we need to give a lot of deference to her finding. Well, there should be zero deference to her finding that the claims were exceptionally weak, because that's really an issue of 101 that this court is uniquely positioned to decide. As far as Selspin's conduct, she didn't find that there was litigation misconduct. She just vaguely said it contributed to my holding. If — if the 101 holding is reversed, then the 285 holding should clearly be reversed. The things she did rely on were the — the timing of the complaint, and that was clearly — just clearly erroneous. As the court's seen, it was within three days of when amendments were allowed under her order, and that it was within a couple weeks after Berkmer and Atrix. There's just nothing improper or even that contributes to exceptionality for counsel doing their — their job in heeding new case law and — and making filings in accordance with that. Her observation or finding or it contributed that Selspin didn't agree to stay discovery, clearly erroneous. If Selspin said, Your Honor, take a look at our response before you decide whether to stay discovery, if — if you're going to — if it looks like you're going to grant it, then stay discovery, ultimately, when we went to the 101 hearing, her reaction was negative, and we agreed to stay discovery. It's just — it's just — there is just no plausible set of facts. Those are the facts. Those are the facts that are laid out for the court, and those conclusions based on that are just clearly erroneous. I'll reserve the rest of my time, Your Honor.  BENNETT. I, Mr. Bennett, veneer. MR. BENNETT. May it please the Court. Atrix is not a license to rewrite a patent. After the Atrix decision came out, there were — there was an amended complaint filed by Selspin. But what that amended complaint did was take the arguments that Selspin had made in opposition to our motion to dismiss and import them, lift them whole cloth, and place them in the amended complaint. JUSTICE GINSBURG. Well, that doesn't — that's not what the trial court focused on. The trial court said the timing of the motion to amend was bad, but — but he's right. A, it was right after our court's decisions in Berkheimer and Atrix, and B, it was within the bounds of what the court allowed. So the court didn't say, I didn't like the amended complaint, but the court said I didn't like the timing of the amended complaint. So how does that support a 285 finding? MR. BENNETT. Well, there's actually two things to that, Your Honor. First, she did not like the amended complaint because she said these allegations have been pulled out of thin air, that they're not tied to the specification. JUSTICE GINSBURG. And again, this goes back to what we said before. She didn't apply Berkheimer properly, and she didn't apply Atrix properly. So she was wrong to say that they had to be called out, that those exact same things had to be stated in the specification, and she was wrong to say that Berkheimer has no meaning at the motion-to-dismiss stage. So if those were the grounds for her merits assessment, then how can that support a 285 finding?  BENNETT. So let me take them both in turn. First, Atrix. Now, in Atrix, there was the issue of the data file, the inventive data file. And this Court found that there were allegations in the complaint that were tied to the specification because the specification explained how this was unconventional, this particular data file was inventive. And the defendants in that case even conceded that there is nothing in the specification that says that this data file is conventional. That's not the case here. Here, what they've alleged as inventive, the specific techniques that Judge Toronto was asking about, this polling or this cryptographic encryption, none of that is described in the specification with any kind of specificity, such that we would know when the inventors applied for their patent and disclosed what they invented, they were supposed to tell us what they invented. They didn't say anything about battery. They didn't say anything about this polling. That's not what she said was, and this goes back to the merits, but what she said was you can't claim a benefit if that benefit is not expressly stated in the specification, period. And that is wrong under Atrix, right? Well, that would be wrong. And that was her basis for a 285. The problem is, is to say, and she never looked at step two in the 285 analysis, right? No, she did, Your Honor. And actually, I want to... No, she talked about step two. And if we look at her opinion... In the 285 opinion? No, in the 285 opinion, she did not. You're right. Well, she did not. We have to look at these things, and we have to determine the basis upon which she said sanctions were appropriate. She said sanctions are appropriate here because this is clearly an abstract idea, period. Step one, full stop, right? Well, but she didn't say sanctions were appropriate. 285 is not about sanctions, it's about exceptionality. And this court held that... Exceptionality, because it's an abstract idea. That's not the end of the inquiry, though, under 101. That's true, Your Honor, but she had already issued an opinion where she addressed both step one and step two in her decision on the omnibus motion to dismiss. And in that opinion, she addressed why she thought the claims were abstract, because they were similar to the kinds of claims that a substantial precedent had dismissed for being just data manipulation, and that the conventional things that they were pointing to had no basis in the specification. What about the fact that in the 285 ruling, she said that the Federal Circuit has said there's no presumption of validity in the 101 context, and she cites a concurring decision by Judge Mayer? I mean, this court has never said that. That's true, Your Honor. This court has never said that. She also cited a district court opinion from within her district. So she said that there is no presumption of eligibility. But even if there were a presumption of eligibility, presumptions can be overcome. And in this case, these claims are so analogous to data manipulation claims in other cases where the Federal Circuit has held claims to be ineligible, that they were woefully weak. I guess I'm just not sure what we do where you have a 285 decision that is premised on three or four misstatements of the law and three or four misstatements of the record. I mean, I don't know how you can fault or she could fault them for not staying discovery when the record discloses exactly what your friend on the other side described, which is they said, Judge, we don't think you need to stay discovery at this point, but we're about to file our brief. Take a look at it. And if you want to stay discovery, then go ahead. And she didn't. So how are they at fault for that? Well, they're at fault, Your Honor, because first, she's looking at the totality of the circumstances. So she's looking at everything. And for example, the timing of the amended complaint, she mentioned that the timing on its own is insufficient for exceptionality, but combined with everything else, it was a problem. If the timing was not improper, which I don't see how anyone could say it was improper, how does that get to be an add-on? I think the timing, the reason that it was improper, Your Honor, is because it is true they submitted their amended complaint after Atrix and Berkheimer came out in February and they submitted their complaint in March. But their amended complaint, the second one, was filed on Friday night before the Tuesday morning hearing or Tuesday afternoon hearing. And at that hearing, opposing counsel said, we have alleged in our second amended complaint all of these benefits, all of these unconventional aspects, and therefore, you cannot grant this motion to dismiss. And her issue is, that would be true if this was tied to the specification. What they did, as far as the timing was... Well, she didn't say tied to the specification. She said everything in the amended complaint had to be spelled out in the specification. So you guys have been using this phrase, tied to the specification, but that's not what the court said. But there has to be some tie to the specification, Your Honor. They can't just write in their complaint, all of these things were unconventional. And because they wrote that, now you can't have a 101 decision at 12b-6, just because they say it, that it's true. They did more than just assert it. So I'm looking in particular at 2289 of the appendix, which is in their amended complaint. And this is on the HTT point. And they say, in 2007, which I guess is the priority date here, mobile phones were not using HTTP for sending data. Google and Facebook introduced using HTTP APIs later than that. And they cite some website. Your Honor, that's actually Selspyn's website. Selspyn's website. That at least has a kind of specificity to it about a particular point. What's insufficiently specific about that? That particular point is not in the claims. The claims don't require HTTP connectivity. They don't require that these mobile phones use these things. They require simply a Bluetooth-enabled capture device, and then a non-enabled device, and the transferring of data between these two devices. So as far as the claims are concerned, any way you get to the internet is just fine. That's correct, Your Honor. What they are using is Bluetooth. Bluetooth, as the specification states, was already extant at the time of the patent filing. And they used Bluetooth not in an unconventional way. They used Bluetooth to transfer information, transfer data, between paired devices. That is precisely the conventional use of Bluetooth, is transferring data between conventional devices. So Judge Gonzales-Rogers is looking at these claims and trying to determine what is the inventive aspect here. What is this technical improvement such that you would survive 101? Can you look at Claim 1? Isn't the last step of Claim 1 claiming the use of HTTP? I mean, how can you say it didn't claim it? Use HTTP to transfer the new data received. Your Honor, I'm looking at Claim 1 of the 794. Joint Appendix 336. It says receiving... Different patent. There were four patents. The last, the very end. This is the 847, I speak. 847, got it. Okay. Yes, Your Honor. At the end of 847, that claim says use HTTP to transfer the new data received over the established paired Bluetooth wireless connection. So with respect to that claim, there is HTTP. But it's using HTTP for its conventional use, the transferring of data. Right, but so now just go back to that place in the amended complaint with a couple of citations about HTTP was not being used by mobile devices at the time. Well, that's what they allege, but there's nothing in the specification that says that HTTP wasn't in use. Yes, but then we're back to this idea that any fact bearing unconventionality actually has to be affirmatively supported by the spec, which I think is not our law. If it's contradicted by the spec, that's another thing, but we don't have a situation like that. No, we don't have a situation where it's necessarily contradicted except that there is language in the claim, in the specification about how this method, the purported allegedly inventive method, can be used with pervasive, flexible technology, things that were already in use at the time of the invention, things like Bluetooth, like HTTP. Well, the law is very clear that you can come up with new ideas that build on old ones, that a different combination of old ideas is patentable. That's true, Your Honor, you can. But just because something is new doesn't mean that it's eligible for patenting if what you've come up that's new is still abstract. If you are claiming it... Well, no. It can be abstract as long as it's inventive. So then that's the step two analysis. And at that point, there's got to be something that bears on the unconventional use of these technologies, because every technology here is just general technology. It's a general computer device. It's a general protocol for transferring data, whether it's HTTP or it's Bluetooth. It's all this general technology being used in its conventional manner, the way that you would expect it to operate. They haven't improved Bluetooth. They haven't improved a capture device. They haven't improved the mobile device. They're just saying, instead of taking something and capturing it with the device and then manually having to take that data and move it to the Internet-incapable device, or the Internet-capable device, excuse me, to publish the data, instead, we just do that automatically. And how do we do that automatically? We use these transfer protocols that have already been in use at the time of the invention. And Judge O'Malley, you had some concern about how Judge Gonzales-Rogers addressed Berkheimer. And specifically, I think... Yeah, I mean, you're arguing the merits now. What I'm saying is that your friend at your own table conceded that the Berkheimer reference, that her basis for distinguishing Berkheimer was wrong, right? And that we should just ignore that. So clearly, if her basis for distinguishing Berkheimer, some of her legal basis for her merits decision were wrong, that has an impact on whether or not it was so obviously frivolous to bring this case. But the statement that she made may have been incorrect as far as the burden at the 12B6 stage versus summary judgment. But if you continue reading the footnote, she distinguishes Berkheimer on a different basis. So specifically, I'm looking... Well, then both of them are wrong. Well, if we look at... They're both wrong. Her statement that Berkheimer is distinguishable because that described this inventive feature that was described in the specification... Right, so they're both wrong. So she says Berkheimer doesn't apply, A, because it was at the summary judgment stage, and B, because everything has to be called out in the spec in order to count. And that's not true because she already had Atrix at that point. That's true. She did have Atrix. But again, Your Honor, in Atrix, there was something to go back to the specification. And here, there isn't anything to go back to in the specification because what they did was take their attorney argument from the opposition and import it whole cloth into the amended complaint and say, because we've made these allegations, you can't address this issue at 12B6. And that can't be the case. We can't allow litigants to simply amend their complaint or file complaints that allege unconventionality without some kind of tie to the specification. And so she applied octane fitness, which is the correct law with respect to 285. She used her discretion to address the totality of the circumstances. She looked at not only the objectively weak nature of the asserted claims, but also the litigation conduct, the way that they filed things. And the timing wasn't just with the second amended complaint. The first amended complaint, they filed the day after an hour-long scheduling conference with the court the way they had never mentioned that they intended to amend the complaint. So there were several things that the court was disturbed by. Also, their defense of the eligibility of the claims at the hearing. The opposing counsel was asked over and over again to please identify the inventive concept. And the only answer that she got was that there was this distillation from the claims or this flow. That whole discussion related to abstract idea, not the inventive concept. That's true, Your Honor, but I'm just So you're mischaracterizing that hearing exchange. Well, no, Your Honor, because she asked specifically what in this patent teaches What's not abstract is what she said. What's not abstract, but also what is taught by this patent such that there would be something inventive. And there wasn't an answer, at least not a satisfactory answer to the court. And so in her discretion, she took all of these things in mind and made her decision. And therefore, because she did not abuse her discretion, we ask this court to affirm her decision and uphold the exceptionality of this case. Thank you, Mr. Bonilla. Mr. Edmonds has some rebuttal time if he needs it. Thank you, Your Honor. One thing to really focus on is, and it's on Appendix 6006, which was just critical to the 285 finding was that Celspin, quote, ignored substantial precedent dismissing analogous data manipulation patent claims. And it references TLI, and in the footnote below, it references seven more. There's just simply no, if you look at the claims in those, this court is very good at that. When litigants come up and they say, well, our case is like this one, you have to look at the claims. And there's just simply no basis for her to conclude that those claims are analogous. They're just, they're all very, very different claims. And what she was likening it to was, like in Inventor Holdings, to where it was a fundamental economic concept. And so it was so much like Alice that Inventor Holdings should have known better. But there's just simply nothing like that in this case. And the district court didn't support that sweeping opinion and review the case as it's simply unsupportable. That's clear error. As the Court, as Your Honor, Judge O'Malley pointed out, she only looked at Step 1. She didn't look at Step 2. Even if the claims were manifestly abstract under Step 1, that's not sufficient for a 285 holding because you have to look at Step 2. As this Court knows, most cases that come before this Court, the vast majority fail Step 1. So, and really Step 2 has to be looked at in terms of the totality of the circumstances, which she didn't do. The Court had it right. She was wrong about this presumption of patentability. Moreover, the district court clearly erred in just disregarding the fact that the 847 claims had been allowed post-Alice and that the 766 claims, which we include in the appendix, which are very much like these claims. It's got the limitations of the paired Bluetooth and the event notification done with the paired Bluetooth. 766 is really written at the data capture device as opposed to the mobile, but those were allowed in February of 2018. So when you look at was a party so bad for not knowing up front that their claims were invalid, one of these patents, the claims had been allowed after Alice, and other similar claims were being allowed not only after Alice, but after all these other claims. And she just ignored that. She should have at least considered it, but she got hung up on this presumption issue, which she got wrong, unfortunately. My colleague criticizes Selsman's argument at the hearing. I don't think that's a fair reading of the hearing. In any event, that wasn't a basis for the 285 ruling. My colleague criticizes the content of the complaint and says that it shouldn't be given weight. That wasn't part of the 285 ruling either. It was just the timing, which we've already addressed. My colleague talked about what distinguishes this case is that things are called as conventional, but there's, and we pointed out in our brief, it talks about it can be implemented in pervasive technologies, but not with pervasive technologies. It's very clear the specification is saying that there is an invention here, and as the court correctly said, you can put together building blocks, even if some of those building blocks were combinations, and there's nothing exceptional about that. What we have is, even it led over to the 285 discussion, there's a dispute between the parties over what's conventional. There's a dispute between the parties as to whether the combination is conventional. There's a dispute between the parties as to what the benefits are. There's a dispute between the parties of what's inventive. And the appellees can't, they can't even defend the 285 without trying to get into those disputes and put their spin on it. But all those facts should have been in, reviewed in Selfspin's favor. And at a minimum, it illustrates that when you have good faith, substantial, factual disputes between the parties in a complicated area, that that's not exceptional. And certainly there's nothing about the conduct of the case that would lend to an exceptionality finding. Thank you, Mr. Edmonds. We appreciate your argument. The case is submitted. Thank you, Your Honor.